IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF:
   **a)** 602 Appaloosa Dr., Ashland, MO 65010
   **b)** The person of Scott Alan BARKER

Case No. 23-SW-03050-WJE

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Nicholas Zotos, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 602 Appaloosa Dr., Ashland, MO 65010, hereinafter "PREMISES," further described in Attachment A-1, as well as the person known as Scott Alan BARKER, further described in Attachment A-2, for the things described in Attachment B.

2. I am a Special Agent with the Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been since November 2017. I am currently assigned to the HSI office in Saint Louis, Missouri and am affiliated with the Missouri Internet Crimes Against Children Task Force. In that role, I investigate federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography. I completed training on these and related topics through the Federal Law Enforcement Training Center (FLETC), the National Criminal Justice Training Center, the National Law Enforcement Training on Child Exploitation, and through various in-

service trainings offered through my agency and external partners. That training includes the requirement to observe, review, and classify numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in several forms of electronic media. I am a graduate of the Treasury Computer Forensic Training Program's Basic Computer Evidence Recovery Training and Basic Mobile Device Forensics courses. I hold an A+ certification from the Computing Technology Industry Association. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A, and I am authorized by law to request a search warrant.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

**PROBABLE CAUSE**

4. On July 5, 2023, I received information from the HSI Cyber Crimes Center (C3) that the United Kingdom (UK) National Crime Agency (NCA) submitted a report to HSI pertaining to a video depicting child pornography UK law enforcement discovered on the device of a suspect as part of their own ongoing investigation. The video titled "daddy next to son.avi" depicts an adult male sitting in a home with a small male child estimated to be 12 months old on his lap. The adult male exposes his erect penis and masturbates before moving his penis to the child's hand, so they touch, while the adult male continues to masturbate. Believing the video may have originated from the United States, the NCA provided the video to HSI C3 for further investigation.

5. HSI Special Agents assigned to victim identification worked to identify the minor child and the adult suspect depicted in the video. In doing so, they used a facial recognition technology which surveys open-source (public) images on the internet for possible matches. That tool provided possible matches to several publicly available images purporting to be Scott BARKER of Ashland, MO who works or worked as a Sports Information Coordinator for Columbia College and is often depicted in internet publications related to college athletics. Those agents referred the lead to my office for further development. Upon receipt of the lead, I personally reviewed the information provided by the NCA, including the video "daddy next to son.avi" and found it meets the definition of child pornography as defined by 18 USC § 2256(8)

6. I found a publicly available Facebook profile for "Scott Barker" listing a birthdate on October 9, 1991, which matches official passport and drivers license records for BARKER, and lists employment as a Sports Information Coordinator for the American Midwest Conference. Most notably, the main profile picture of the profile depicts an adult male and a small male child both with their tongues sticking out. The adult male from the Scott Barker profile matches the likeness of the suspect depicted in "daddy next to son.avi" and the small male child depicted in the profile picture matches the likeness of the minor victim in the video depicting the child sexual abuse.

7. I personally reviewed known photographs of BARKER from his US passport and Missouri drivers license and attest they match the likeness of the depictions of Scott Barker in the Facebook profile as well as the suspect from the child sexual abuse video.

3

8. Also present on the Scott Barker Facebook page is a video, posted July 3, 2022, of the same small male child depicted in the main profile picture, and who appears to be the same child depicted in the child sexual abuse video. In the video, the child is in a highchair playing with a cup. In the background, in the corner of the room, there is a distinctive tall black metal shelving unit. That shelving unit has black and white garland decoration draped amongst the shelves and green or turquoise bird decoration on the second shelf from the top. That same metal shelving unit, with black and white garland decoration, and green or turquoise decoration on the second shelf from the top can be seen in the corner of the room in the child sexual abuse video. Both videos also share the same wood stain trim on the interior of the home.

9. The Scott Barker Facebook profile also indicates the small male child depicted in numerous pictures and videos across the page is the son of BARKER and was born on or about June 4, 2021. The NCA reported the child sexual abuse video was made in 2022 and the minor victim in the video was approximately 12 months old, which is consistent with BARKER's son being the victim in the video.

10. I reviewed publicly available county tax records pertaining to Scott BARKER and found he purchased the PREMISES with his wife on November 6, 2020. I reviewed a publicly available real estate listing for the PREMISES. While the listing did not show the PREMISES as actively for sale, it still displayed several photographs of the exterior and interior of the home from when it was last listed for sale in 2020. One photo shows a view from the family room across to the kitchen and dining area with white double doors with glass panes leading to a sunroom in the background. The style of wood stain cabinetry, wood trim around white double

4

doors with glass panes, and placement of a recessed can lights and air vent on the ceiling found in the listing photograph of the PREMISES all match the background in the child sexual abuse video.

11. On June 11th and 12th, 2023 members of the Boone County Sheriff's Office Cyber Crimes Task Force surveilled the PREMISES and observed two vehicles parked in the driveway; 1) a white 2018 Honda Odyssey van bearing MO license plate RB3A1E registered to Cassandra Barker with title on death to Scott BARKER, and 2) a black 2010 Honda Accord sedan bearing MO license plate LG9E1K registered to Cassandra Strope (Cassandra Barker's maiden name). Both vehicles are registered to the PREMISES address.

## TECHNICAL TERMS

12. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

13. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

14. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

6

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

15.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information

9

stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in

advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to produce and distribute depictions of child pornography the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet

11

discussions about the crime; and other records that indicate the nature of the offense.

16. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

17. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant. The warrant would also permit the on-scene preview of storage media in order to capture RAM or other live acquisition data which may become unavailable if the device is removed from the PREMISES as well as to triage devices to determine their likelihood to contain information sought in Annex B.

13

18. Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

19. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

    a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

    b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as

14

Case 2:23-sw-03050-WJE    Document 1-1    Filed 07/14/23    Page 14 of 18

the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

        c.       If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

        d.       In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

        e.       As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed

16

by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

  h. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

  20. While law enforcement review of public and government records and in person surveillance suggests that Scott BARKER primarily resides at the PREMISES and is likely to be found there, it is nearly impossible to predict with certainty when BARKER will be present. Even with extensive pre-execution surveillance, operational and safety considerations may make it impractical to execute the warrant while BARKER is on the PREMISES. As such, I request this warrant also extend to the person of Scott BARKER, his belongings, and effects anywhere he may be found in the public or in a mobile conveyance operated on a public roadway.

## **CONCLUSION**

  21. I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

**REQUEST FOR SEALING**

22. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

_____
Nicholas Zotos
Special Agent
Homeland Security Investigations

Attested to in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone or other reliable electronic means on this the 14th day of July, 2023.

_____
**Willie J. Epps, Jr.**
United States Magistrate Judge